IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Julie A. Su, Secretary of Labor,[1] United States Department of Labor, <br><br> Plaintiff, <br><br> v. <br><br> David Fensler et al., <br><br> Defendants. | No. 22-cv-01030 <br><br> Honorable Nancy L. Maldonado |

**MEMORANDUM OPINION AND ORDER**

Julie A. Su, Acting Secretary of the United States Department of Labor (the "Secretary"), brings this case pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against Defendants David Fensler; Herbert O. McDowell III; L. Steven Platt; Robbins, Salomon & Patt, Ltd. ("RSP"); Robbins DiMonte; David Schwalb; United Preferred Companies, Ltd; John Fernandez; Gary Meyers; and the United Employee Benefit Fund Trust (collectively, "Defendants"). Pending before the Court is the Secretary's Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 117). The Secretary asks the Court to issue a temporary restraining order and preliminary injunction removing Defendants John Fernandez and Gary Meyers (the "Trustee Defendants") from their positions as Trustees for Defendant United Employee Benefit Fund Trust (the "Fund"), and appointing in their place an independent fiduciary, Receivership Management, Inc., which would have exclusive authority over the Fund and its assets. The Fund, Fernandez, and Meyers oppose the motion. (Dkt. 123.)

---

[1] In accordance with Fed. R. Civ. P. 25(d), Julie A. Su, the Acting Secretary of Labor, is substituted as the Defendant in this case in place of the former Secretary of Labor, Martin J. Walsh.

1

The Court heard oral argument on the pending motion on August 7, 2023. The Court has considered the parties' briefing, the parties' evidence and argument offered at the hearing on the motion, the parties' post-hearing submissions, and the brief submitted by an *amicus curiae*. For the reasons stated in this Opinion and Order, the Secretary's motion is granted.

## Background[2]

According to the Secretary, the Fund operates as a multiple employer welfare arrangement (MEWA) that provides death benefits to ERISA-covered participating plans established by participating employers. While the Fund and Trustee Defendants dispute that the Fund is a MEWA, the Court need not resolve this factual dispute for purposes of this motion. As noted below, the Court has already ruled it has subject matter jurisdiction over the Secretary's claims, and the Fund and Trustee Defendants themselves concede that they are subject to ERISA. Thus the precise nature of the plan, whether it is a MEWA or Taft-Hartley Plan (as Defendants contend), does not impact the Court's authority to issue a preliminary injunction at this stage.

The individual participating plans that are a part of the Fund are negotiated through collective bargaining agreements between the participating employers and employees who are members of the National Production Workers Union Local 707. The Fund receives contributions from the participating employers and uses those contributions to purchase life insurance policies, owned by the Fund, that pay out death benefits to an eligible employee's designated beneficiary if the eligible employee dies while employed by a participating employer or in retirement. The Fund's trust agreement requires two Trustees, both of whom are named fiduciaries for the purposes of ERISA. The Fund's trust agreement grants the Trustees the authority to manage the operation

---

[2] The Court takes the background largely from the operative Complaint (Dkt. 1) as well as from the parties' briefing on the pending motion. (Dkts. 118, 123, 129.) Where the facts are in dispute, the Court will note the parties' respective positions.

and administration of the Fund, and grants them control and authority over all of the Fund's assets. The current Trustees of the Fund are Defendants John Fernandez and Gary Meyers.

After conducting an investigation into the Fund's activities, the Secretary initiated this action in February 2022 against the 10 Defendants named above for alleged violations of ERISA in connection with the operation of the Fund. The Secretary generally alleges that Defendants breached their fiduciary duties, or participated in fiduciary breaches, by using Fund assets in prohibited transactions that were against the interests of the Fund and its beneficiaries, causing losses to the Fund. (*See* Dkt 1., Compl.) The Secretary alleges that the Fund lost at least $3.3 million, not including lost opportunity costs, due to the Defendants' actions.

In addition to the instant lawsuit, there are several other federal and state actions pending relating to the Fund's operations and the same essential underlying conduct at issue here. The Fund, represented by its current counsel Baker Botts LLP, has itself filed two federal lawsuits in this District against many of the same Defendants named by the Secretary. *See Sledz v. McDowell et al.*, Case No. 1:21-cv-05238, and *Sledz v. Platt et al.*, Case No. 1:22-cv-00952. Three individual participants are also suing the Fund and several of the same Defendants named here in this District for their benefits and for ERISA violations. *See Futterman v. UEBF et al.*, Case No. 20-cv-06722, *Riskus v. UEBF et al.*, Case No. 23-cv-00060, and *Fulton v. UEBF et al.*, Case No. 23-cv-02468. There are also at least two insurance coverage disputes related to the Fund's activities pending in state court, and a third state court action involving an indemnity agreement related to Defendant Platt.

After some initial proceedings in this lawsuit, including a motion to dismiss brought by several Defendants, which the Court denied, the parties jointly moved to stay the action and any discovery so that they could participate in a global mediation covering this action and several of

the related lawsuits noted above. The mediation was held in May 2023, and while the Secretary reached a settlement in principle with Defendant Schwalb, it did not reach a settlement with any of the other Defendants.

Shortly after the failed mediation, on June 15, 2023, the Secretary filed the instant motion for a temporary restraining order and preliminary injunction seeking to remove the Trustee Defendants from their positions at the Fund and to transfer control of the Fund and its assets to an independent fiduciary. The Secretary claims that the Trustee Defendants breached their fiduciary duties under ERISA and engaged in a series of prohibited transactions and are continuing to violate their fiduciary responsibilities to the Fund by approving the Fund's escalating and unreasonable expenditures on legal and administrative fees related to those breaches, which is rapidly depleting the Fund's assets. In particular, the Secretary indicates that the Fund reported assets of approximately $22 million as of December 2018, and that the Secretary learned through the course of proceedings in the *Futterman* case, one of the related cases brought by an individual participant, that those assets had been reduced to roughly $12 million as of April 2023. The Secretary further states that it learned through the course of the global mediation in May 2023 that assets of the Fund were "dramatically less" than the $12 million figure that the Fund's counsel had represented to the Court in the *Futterman* case just a month before. As for the cause of the loss of assets, the Secretary points primarily to the millions of dollars in legal fees charged by the Fund's lead counsel and his firm Baker Botts, which also represents the Trustee Defendants in this action. The Secretary asks the Court to appoint an independent fiduciary to take control of the Fund and ensure that its assets are not imminently and completely dissipated by the Trustee Defendants' continued rubber-stamping of substantial and unreasonable legal and administrative expenses that are not in the interests of the Fund or its participants.

After the Secretary filed its initial motion and the Court set a briefing schedule, the Court held a status hearing at the Secretary's request, during which the Secretary additionally requested that the Court enter an immediate asset freeze on the Fund's assets pending the Court's resolution of the broader motion. The Court ultimately denied the motion for an immediate asset freeze, finding that the Secretary had failed to show there was an imminent harm of the Fund's assets being completely dissipated in the short time before the Court could rule on the broader issue of the appointment of an independent receiver. (Dkt. 132.) The parties therefore proceeded with briefing the Secretary's motion seeking an independent fiduciary. The Court held a motion hearing on August 7, 2023, during which the parties presented oral argument and additional evidence in support of their positions. Separately, Ronald L. Futterman, the plaintiff in one of the separate individual actions, filed a motion to appear as *amicus curiae* and to file a brief in support of the Secretary's motion for a temporary restraining order and preliminary injunction. (Dkt. 134.) The Court granted the motion, and has considered the brief submitted by Futterman in support of the Secretary's position.[3] Both sides have also submitted motions for leave to file post-hearing memoranda. (Dkts. 143, 144.) The Court grants both motions, and has considered the parties' additional post-hearing submissions.

## Discussion

The Secretary asks the Court to remove the Trustee Defendants from their positions at the Fund and to appoint in their place an independent fiduciary with authority over the Fund and control over its assets. The Secretary styled its motion as a request for both a temporary restraining

---

[3] Joe D. Fulton, another individual plaintiff in a related action in this District, also filed a motion to appear as *amicus curiae* in support of the Secretary's position. (Dkt. 139.) Fulton did not file a separate brief, but rather simply asked the Court to recognize his interest in the proceedings and to adopt the arguments made by Futterman in support of the Secretary's motion. The Court will grant Fulton's request, given that he seeks to merely join in arguments already made by Futterman, which the Court has ruled it will consider.

order and a preliminary injunction. While a temporary restraining order and preliminary injunction are generally governed by the same standard, a temporary restraining order is generally issued as immediate emergency relief without the response of the opposing party. As the Fund and Trustee Defendants have had an opportunity to respond, and the Court has already separately ruled on the Secretary's emergency request for an asset freeze, the Court will analyze the motion solely in terms of the request for a preliminary injunction.

"To obtain a preliminary injunction, the moving party must make an initial showing that (1) it will suffer irreparable harm in the period before final resolution of its claims; (2) traditional legal remedies are inadequate; and (3) the claim has some likelihood of success on the merits." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 323–24 (7th Cir. 2015) (citations omitted). If the Court finds these standards are met, the Court then "weighs the balance of harm to the parties if the injunction is granted or denied and also evaluates the effect of an injunction on the public interest." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012). The Court's balance of harms is done on a "sliding scale," dependent on the movant's likelihood of success on the merits. *Id.* This means that the greater a party's likelihood of success on the merits, the less the balance of harms need weigh in that party's favor, and vice versa. *Id.*

As discussed further below, based on its review of the applicable factors and in balancing the harms and evaluating the public interest, the Court finds it appropriate to issue the preliminary injunction requested by the Secretary.

**A. Irreparable Harm**

In assessing irreparable harm, courts analyze whether the party seeking a preliminary injunction faces a harm that "cannot be prevented or fully rectified by the final judgment after trial." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). The Secretary

argues that an injunction removing the Trustee Defendants and appointing an independent fiduciary is necessary to prevent further loss of Fund assets. The Secretary maintains that the continued loss of assets to pay unreasonable and excessive legal and administrative costs in the period before any final judgment will cause irreparable harm to the Secretary's ability to seek equitable relief to restore improperly spent assets to the Fund, and cause irreparable harm to Fund participants. The Secretary additionally argues that there is a risk of irreparable harm because the Trustee Defendants have indicated that they wish to terminate the Fund completely, and in the event of termination, the Trustee Defendants will have the power to distribute the Fund's assets as they see fit, which could include exhausting the Fund's assets by paying service providers and legal fees first, leaving plan participants with nothing. The Fund and Trustee Defendants argue in response that there is no risk of irreparable harm because there are insurance policies in place that can cover the benefits of active plan participants, and further argue that counsel for the Fund is actively engaged in several legal actions to recover stolen assets from the Fund which will restore lost assets and protect participants. The Fund and Trustee Defendants also dispute that they can unilaterally terminate the Fund. The Court ultimately finds that the Secretary has demonstrated irreparable harm supporting the issuance of an injunction.

The parties are in agreement that the Fund's reported assets have decreased in recent years. The parties are also in agreement that the Fund's assets are determined largely based on the cash surrender value of the life insurance policies owned by the Fund. (Dkt. 118 at 13; Dkt. 123-6 ¶ 7.) The Fund's accountant currently estimates the total assets of the Fund to be approximately $6.3 million. (Dkt. 123-6 ¶ 4.) That figure includes cash and the cash surrender value of the Fund's policies, which are valued at approximately $5.6 million. (Dkt. 123-6 ¶ 7.) As the Secretary notes, however, the accountant himself acknowledges that the cash surrender value figure may be

7

significantly lower due to difficulties in ascertaining the precise value of redeemable policies. (*See id.*) In terms of the Fund's current participants: there are nine active employers and 32 active participants, though those numbers have been the same since 2012 with no new participants appearing to have joined the Fund for more than a decade. (*See* Dkt. 123 at 34.)

As to the evidence regarding the Fund's obligations and expenses on legal and administrative fees: as of May 2023, the Fund's counsel Baker Botts has billed the Fund approximately $6.2 million in legal fees since they began representing the Fund around November 2020, or an average of more than $200,000 in legal fees each month since the representation began. (Dkt. 118 at 18.) Of the $6.2 million in legal fees, $3.1 million of that was still outstanding as of May 17, 2023. (Dkt. 129 at 26.) Counsel for the Fund confirmed the accuracy of those attorneys' fees figures at oral argument, but was unable to provide a more up-to-date figure reflecting the legal fees that have been incurred since the mediation in May 2023 through the date of the hearing on August 7, 2023, which would include briefing on the instant motion. In terms of ongoing fees, the Fund's lead counsel reported at oral argument that he charges approximately $1,265 per hour for his work for the Fund, and that the other Baker Botts partners who work on the Fund's matters charge comparable rates. Additionally, it is undisputed that the Fund has been paying thousands of dollars in monthly administrative fees to Fund managers. Specifically, the Fund employs a Fund Manager for $6,500 a month and a litigation manager for $1,000 a month to oversee the multiple ongoing lawsuits the Fund has brought. That litigation manager also previously served as a Fund manager and was compensated $5,000 a month for that role. These individuals appear to have been selected by Baker Botts and approved by the Trustee Defendants.

Taken altogether, the above evidence supports the Secretary's contentions that the Fund's assets have dramatically decreased in recent years and that there is a substantial risk those assets

8

will be depleted further from ongoing substantial administrative and legal expenses that have been and continue to be approved by the Trustee Defendants. Simple math makes the Fund's current trajectory unsustainable and precarious for the Fund's participants. The Fund's assets have diminished from a reported $22 million in 2018 to a current total value of approximately $6.3 million, though the actual value may be even less given the uncertain nature of the estimated $5.6 million cash surrender value of the policies.[4] Of that $6.3 million dollars, the Fund owes Baker Botts some $3.1 million in legal fees as of May 2023, with thousands (or likely tens of thousands or more) in fees and administrative costs accruing each month. These fees and costs have been approved by the Trustee Defendants, who are represented by the same counsel to whom the fees are due. The Secretary's concern that the Trustee Defendants will continue to approve costs that run the risk of further depleting Fund assets to the point that full relief will be impossible and the operation of the Fund, and participants' benefits, will be at risk, is well-founded.

This brings the Court to the Secretary's concern that the Trustee Defendants have indicated a desire to terminate the Fund outright. Counsel for the Fund and Trustee Defendants have represented that the Trustee Defendants do not have the unilateral authority to terminate the Fund, but instead need consent from the employee union, and that the Trustee Defendants would not take steps to terminate the Fund pending the litigation. But regardless of whether the Trustee Defendants can unilaterally terminate the Fund, the Court credits the Secretary's concern that the Fund's substantial expenditures may result in a de facto termination, wherein the Fund simply does not have sufficient assets to continue functioning. In the event the Fund is unable to satisfy all of its financial obligations, the Court agrees with the Secretary that there is a risk that the Trustee

---

[4] The Fund and Trustee Defendants dispute the $22 million figure that was reported to the Department of Labor in 2018, arguing that the figure was never appropriately verified. (*See* Dkt. 123-6 ¶ 4.) But Defendants provide no alternative figure as to what the actual value was as of 2018. And regardless of the true past figure, what matters now, as discussed further below, is the current value.

Defendants will prioritize payment to service providers (e.g., attorneys) over the protection of participants. Indeed, the Secretary has provided evidence that this kind of prioritization of payments to service providers has already occurred under the Trustee Defendants' watch. The Secretary notes that, as part of its pre-suit communications with Defendants, it helped push Defendant Schwalb to restore approximately $1.4 million in Fund assets that were improperly lost. The Secretary further notes, however, that the Fund's accounting of assets shows only approximately $600,000 out of the $1.4 million in cash remaining in the Fund. Counsel for the Fund conceded at oral argument that the missing half of the recovered money was likely paid out to service providers including legal fees, which the Secretary contends was an improper use of that money. Regardless of propriety, the Court agrees with the Secretary that, at a minimum, the Trustee Defendants' conduct suggests they are prioritizing the Fund's payment of substantial legal and administrative fees, which, given the precarious nature of the Fund's assets, creates a risk of irreparable harm to the Fund's participants.

Finally, the Court notes that it is not persuaded by the Fund and Trustee Defendants' arguments in response. As to the contention that the current Fund participants are protected by their individual life insurance policies, the Court agrees with the Secretary, after the benefit of full briefing and oral argument, that this does not address the nature of the harm at issue. The Secretary is seeking the equitable relief of restoring the Fund to its position as if the prohibited transactions had not occurred, and regardless of whether the current participants are protected, the Secretary's ability to restore the Fund's losses will be irreparably harmed if assets continue to quickly diminish. Further, the Court is not altogether convinced that current participants are fully protected, given that the Fund and Trustee Defendants' own accountant cannot accurately assess the true value of the Fund's assets, and the substantial legal fees outstanding. As to the Fund and

Trustee Defendants' argument that they are seeking to recover Fund assets in other lawsuits, the Court finds that this speculation about the potential timeline and amount of recovery in other lawsuits is insufficient to protect against the potential irreparable harm of the Fund's assets continuing to diminish in the interim.

In sum, the Court finds that the Secretary has met its burden to show there is a risk of irreparable harm should the Trustee Defendants remain in control of the Fund during the pendency of this lawsuit. The Court notes that, in assessing the potential irreparable harm in allowing the Trustee Defendants to continue in their positions, the Court is making no finding on the reasonableness of the attorneys' fees charged by Baker Botts, nor is it passing judgment on the quality or necessity of any work lead counsel for the Fund or his colleagues have performed. The issue before the Court in assessing the irreparable harm is one of math: the Fund has limited and difficult-to-determine assets, obligations to participants, and a large outstanding legal bill with more legal and administrative fees incurred every day. The question before the Court now is not whether Baker Botts has acted appropriately, but whether continuing with the current regime of Fernandez and Meyers in place is appropriate, and whether leaving those Defendants in charge will cause irreparable harm to the Secretary's ability to seek equitable relief and irreparable harm to the Fund's participants. In light of the evidence discussed above related to the Fund's current assets, the rate of its decrease, the Fund's significant expenditures on legal fees and administrative services approved by the Trustee Defendants (some for their own, and not the Fund's defense), and the Trustee Defendants' authority to control and potentially further diminish Fund assets, the Court finds there is a significant risk of irreparable harm to warrant the issuance of an injunction.

### B. Traditional Legal Remedies are Inadequate

Turning to the next factor, the parties' briefing does not focus on whether traditional legal remedies would be adequate in place of an injunction. At oral argument, the Secretary argued that there are no adequate remedies at law because the Secretary's complaint only seeks equitable relief, and in fact the Secretary contends that it is only entitled to seek equitable relief under ERISA. Counsel for the Fund and the Trustee Defendants did not respond to this aspect of the Secretary's argument during the hearing, implicitly conceding the point. In any event, the Court finds that, given that the Secretary is only seeking equitable relief in this lawsuit and is not seeking monetary damages, there is no traditional legal remedy that would be adequate in place of the issuance of an injunction.

### C. Likelihood of Success on the Merits

"A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits. Instead, he must only show that his chances to succeed on his claims are 'better than negligible.'" *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 966 (7th Cir. 2018) (citations omitted). The Seventh Circuit has described this as a "low threshold," though it is not without any standard, and an injunction should be denied if it is clear the party seeking it has no case on the merits. *See id.*

In order to succeed on the merits of its ERISA claims against the Trustee Defendants, the Secretary will generally need to establish: (1) the existence of an employee benefit plan covered by ERISA; (2) the existence of plan assets; (3) that the Trustee Defendants are fiduciaries to ERISA-covered plans; and (4) sufficient facts demonstrating that the Trustee Defendants breached their fiduciary duties in violation of ERISA by approving prohibited transactions. *See generally* 29 U.S.C. §§ 1103(a), 1104(a), 1106. Although the Trustee Defendants and the Fund argue that

the Secretary has mischaracterized the Fund as a MEWA, contending instead that it is in fact a Taft-Hartley Plan, they do not ultimately dispute that the Fund is subject to ERISA, that they are fiduciaries to ERISA-covered plans, or that ERISA-covered plan assets exist.[5] The parties' dispute thus centers on whether the Secretary has provided sufficient evidence demonstrating a likelihood of success on the merits of its claims that the Trustee Defendants breached their fiduciary duties to the Fund and its participants by engaging in prohibited transactions. The Court finds that the Secretary has provided sufficient evidence to meet the "low threshold" required to demonstrate a likelihood of success on the merits.

The Secretary's Complaint and briefing on the instant motion detail a number of allegedly prohibited transactions approved by the Trustee Defendants, including: (1) loaning $1,125,000.00 in Fund assets to purchase McDowell's home out of foreclosure; (2) loaning $260,000.00 to an entity partially owned by Trustee Meyers; (3) paying $895,000.00 in unreasonable compensation to Defendant McDowell; (4) loaning $5,000.00 to McDowell when he was an Employer Trustee; (5) transferring $400,000.00 to McDowell's foreclosure attorney; (6) transferring $84,000.00 directly to McDowell; (7) paying $77,000.00 to McDowell's company to research health benefits for the purpose of starting a new plan or adding health insurance to the Fund; and (8) paying $44,440.42 to McDowell's son as part of a life insurance commissions dispute with a third party. (Dkt. 118 at 4–5.) In their response, the Fund and Trustee Defendants do not dispute that any of

---

[5] The Fund and Trustee Defendants vehemently argue that the Fund is exempt from MEWA status and that the Secretary has incorrectly characterized it as such in an attempt to assert ERISA enforcement jurisdiction. In the same breath, however, the Fund and Trustee Defendants state that "[i]t is not the Fund's contention that it is not subject to ERISA . . . ." (Dkt. 123 at 57.) Indeed, as the Secretary points out, in the lawsuits brought by the Fund, the Fund itself apparently alleges that it is subject to ERISA. (Dkt. 118 at 25 n.11) (citations omitted). Further, this Court has already ruled at the motion to dismiss stage that it has subject matter jurisdiction over the Secretary's claims under ERISA, because the Secretary's allegations and the Fund's governing documents were sufficient to establish that ERISA governs the individual participating plans. (Dkt. 87 at 7–11.) Thus, regardless of whether the Fund is in fact a MEWA or a Taft-Hartley plan, there is no serious dispute for the purposes of the instant motion that the Fund and the Trustee Defendants are subject to ERISA, and that the Court has jurisdiction to issue an injunction.

the transactions took place, but instead generally argue that the Trustee Defendants did not breach their fiduciary duties because the transactions were either made based on the advice of Defendant Platt (the Fund's counsel at the time), or were made by Defendant McDowell (the creator of the Fund and a former trustee and service provider) without the approval of the Trustee Defendants. (*See* Dkt. 123 at 39–42.) The Trustee Defendants thus claim that the Secretary's motion ignores the bad acts by McDowell and Platt, and that their own actions did not violate ERISA.

The Court need not go through the details of each allegedly prohibited transaction at this stage. For the purposes of the present motion, the Court is not convinced by the Fund and Trustee Defendants' attempts to shield themselves from an injunction by placing blame on Defendants Platt and McDowell. As the Secretary points out in reply, to the extent that an "advice of counsel" defense exists at all under ERISA, it has only apparently been recognized in cases involving alleged violations of the fiduciary's duty of care under 29 U.S.C. § 1104(a)(1)(B). *See, e.g.*, *Eyler v. Comm'r*, 88 F.3d 445, 454–56 (7th Cir. 1996). But the Secretary has not brought any violations under this provision of ERISA, and instead claims that the Trustee Defendants breached their duty of loyalty under § 1104(a)(1)(A) and that they caused the Fund to engage in prohibited transactions under § 1106. The Trustee Defendants have cited no authority suggesting that the advice of counsel defense is available under these provisions of ERISA. In fact, the Seventh Circuit has rejected the notion that a party's "good faith" can be a defense against a claim for a breach of a fiduciary duty or duty of loyalty. *See Su v. Johnson*, 68 F.4th 345, 357 (7th Cir. 2023) ("[G]ood faith is not a defense for one breach of a fiduciary duty, let alone the repeated breaches shown here.") (citing *Halperin v. Richards*, 7 F.4th 534, 546 (7th Cir. 2021)*; Leigh v. Engle*, 727 F.2d 113, 124 (7th Cir. 1984) ("Good faith is not a defense to an ERISA fiduciary's breach of the duty of loyalty.")).

Further, even if the defense did apply, the Court is not convinced that it would save the Trustee Defendants from liability. In cases recognizing "advice of counsel" as a defense under § 1104(a)(1)(B), reliance on counsel's advice is just "a single factor to be weighed in determining whether a fiduciary has breached [their] duty." *See, e.g.*, *Eyler*, 88 F.3d at 456 (citation omitted). In other words, even if the defense applied, it is not a complete defense, and the Court would still need to determine whether the Trustee Defendants acted within their fiduciary duty of loyalty in relying on said advice to, for example, approve a loan of $1,125,000 in Fund assets to purchase McDowell's home out of foreclosure. Trustee Defendants have a difficult road to hoe.

At this stage, the Secretary has provided more than sufficient evidence demonstrating that the transactions at issue were not in the interest of the Fund and its beneficiaries but were made for the benefit of the Trustee Defendants, Platt, and McDowell, and to the detriment of the Fund. As fiduciaries of the Fund and its participants, the Trustee Defendants are not permitted under ERISA to blindly approve transactions under the purported advice of counsel when any reasonable oversight would have confirmed that those transactions were self-dealing and not for the benefit of the Fund. Further, it appears that in several instances the purported advice came *after* the transactions were made, undercutting the Trustee Defendants' claims that they were innocent victims of the wrongdoing of Platt and McDowell. (*See* Dkt. 129 at 10.)

In sum, the Court is not persuaded by the Trustee Defendants' argument that the "blame Platt" defense will be a meritorious defense to the Secretary's claims. In other words, this claimed defense is not sufficient to undercut the Secretary's likelihood of success on the merits. The Secretary has more than cleared the "low threshold" required to show a likelihood of success on the merits.

### D. Balance of Harms and the Public Interest

Having found that the Secretary has satisfied the threshold requirements for an injunction, the Court turns to balancing the respective harms and determining whether an injunction is in the public interest. The Secretary argues that an injunction installing an independent fiduciary would serve the public interest because in enacting ERISA, Congress recognized the important national public interest in preserving employee benefits funds, and appointing a receiver advances that interest by protecting the Fund and the benefits of participants. The Secretary goes on to say that the lack of an injunction would undermine that interest because of the potential harm to the Fund's participants if its assets continue to dwindle under the current Trustees. The Fund and Trustee Defendants argue in response that the Fund would be irrevocably harmed by the appointment of an independent fiduciary at this stage, given that the Fund is engaged in several lawsuits and a fiduciary would need to expend significant time and resources to get up to speed and manage the Fund.

The Secretary is correct that, in enacting ERISA, Congress expressly declared a strong national public interest in protecting the security of employee benefits, and therefore the Court agrees that an injunction that protects the assets of the Fund and the benefits of its participants undoubtedly serves the public interest. The question becomes whether the specific relief of the independent fiduciary proposed by the Secretary would serve to promote that goal here, or whether it would do more harm than good to the Fund and its participants and thus undermine the goals of ERISA. The Court finds that, in weighing the potential harms, the issuance of an injunction appointing an independent fiduciary is appropriate and would serve the public interest and goals of ERISA.

The Court is mindful of the implications of appointing an independent fiduciary at this juncture, where the Fund is involved in no less than six different lawsuits (though some, including this one, are essentially in their nascent stages), with millions of dollars of legal fees outstanding. The independent fiduciary will no doubt expend time and Fund resources to get up to speed and manage the Fund, although one would hope that after three years of management (and the expense that entailed), the Fund is in far better shape now than in 2020. The Court finds that any concern about the task facing an independent fiduciary is outweighed by the potential harm to the Fund and its participants in continuing with the status quo with Fernandez and Meyers as Trustees. As noted above, the Fund has experienced dwindling assets due to substantial legal and administrative costs, and that trend seems likely to continue should the Trustee Defendants remain in their position of authority. Additionally, the Secretary has recommended an experienced fiduciary with reasonable fees that do not exceed more than a few hundred dollars an hour, which suggests the fiduciary's expenses will be significantly less than the current monthly legal and administrative expenses being incurred by Fund counsel and the Fund managers. Again, the issue before the Court is primarily one of math, and the Court finds that the math currently playing out under the Trustee Defendants is not working in the best interests of the Fund, and runs the risk of depleting all Fund assets and leaving the participants with nothing and the Secretary with no relief.

Further, the Court is concerned that the Fund's interests, and those of the Trustee Defendants and the lawyers who represent them all, are not all squarely aligned. The Trustee Defendants are accused of misusing Fund assets for their own purposes and the purposes of other fiduciaries, and it strikes the Court as problematic for those individuals to be represented by the same counsel representing the Fund to which they are alleged to have breached their duty. Further, there is evidence in the record that, after learning of the Secretary's investigation into the Fund,

17

the Trustee Defendants approved an amendment to the Fund's governing documents requiring the Fund to indemnify and advance the defense costs for any Trustee, employee, or service provider threatened with, or involved in, litigation. (*See* Dkt. 129 at 28–29.)[6] Under this indemnification agreement approved by the Trustee Defendants, which current counsel for the Fund was apparently involved in drafting, the Fund has advanced thousands of dollars in defense costs, including more than $200,000 in fees to Defendant Platt, whom the Fund itself is suing for alleged breaches of fiduciary duties to the Fund. (*Id.*) The approval of this indemnification agreement to use Fund assets to advance defense costs, after notification of an investigation, is deeply troubling and suggests that the Trustee Defendants may have been acting in the interests of themselves and the other Defendants, and not in the interests of the Fund and its participants.

In noting these issues, the Court is not making any determinations about the existence of an actual conflict of interest in Fund counsel representing both the Fund and the Trustee Defendants who are accused of misusing Fund assets, an issue that was not fully briefed by the parties. The Court is concerned, however, by the appearance that Fund counsel's interest in their outstanding legal fees covering representation of both Trustees and the Fund (whose interests may not be fully aligned), which continue to accrue, is at odds with the goal of preserving the Fund and its assets to protect participants' benefits. At the very least, the Court finds that the current entanglement of Fund counsel with the Fund and the Trustee Defendants, which has resulted in millions of dollars of legal fees and administrative costs, supports the appointment of an independent fiduciary to take control of the Fund and protect its assets and participants. An independent fiduciary can scrutinize the Fund's assets and expenses and chart a path that is in the best interest of the Fund and its participants, and not solely in the interests of the Fund's Trustees

---

[6] Prior to the amendment, the governing documents only allowed for *reimbursement* of costs for litigation after the fact, and only to Trustees themselves, not to employees or service providers. *Id.*

or lawyers.

In sum, the Court finds that the balance of harms weighs in favor of an injunction removing the Trustee Defendants and appointing an independent fiduciary, and that such appointment will serve the public interest, as codified by ERISA, in protecting the participants' benefits. The Secretary has therefore met its burden to show that its requested injunction is appropriate and necessary.

## Conclusion

For the foregoing reasons, the Secretary's motion for a temporary restraining order and preliminary injunction (Dkt. 117) is granted. The Court will issue a preliminary injunction order separately.

DATED: 8/10/23

*Nancy L. Maldonado*

HONORABLE NANCY L. MALDONADO
U.S. DISTRICT JUDGE